IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA

Austin-Andrew Goodman, The Living Man, Private Beneficiary

**RECEIVED**

Plaintiff

v.

**DEC 0 6 2024**

United States District Court
Northern District of Iowa

Defendants:
THOMAS JOSEPH GOODMAN;
CHRISTOPHER AARON MILLER;
GOVERNOR KIM REYNOLDS;
STATE OF IOWA;
IOWA DISTRICT COURT FOR DUBUQUE COUNTY;
DUBUQUE COUNTY;
CITY OF DUBUQUE;
SHERIFF OF DUBUQUE COUNTY;
CITY OF DUBUQUE POLICE DEPARTMENT;
MERCYONE;
IOWA DEPARTMENT OF HEALTH & HUMAN SERVICES;
MEDICAL ASSOCIATES;
DR. ADIB KASSAS, MD;
CATHERINE ANNE GOODMAN;
FLINT DRAKE;
DANIEL DLOUHY;
DAVID ALPORT;
SHELLI HAYES;
MARY BETH FLEMING;
NATALIA BLASKOVICH;
ROBERT RICHTER;
MICHAEL SHUBATT;
JOSHUA VANDERPLOEG
NANCY FISCHER;
DUBUQUE COUNTY ATTORNEYS' OFFICE;
UHCC, INC., d/b/a BRIDGE CITY COLLECTIVE;
CAPRA BANK;
JOHN DOES 1-10;
JANE DOES 1-10.

## AFFIDAVIT OF TRUTH

I, Austin-Andrew: Goodman, being of sound mind and body, do hereby solemnly swear and affirm the following statements to be true to the best of my knowledge, information, and belief:

# I. INTRODUCTION

1. My name is Austin-Andrew: Goodman. I am a real estate professional, community leader, and advocate, with extensive involvement in real estate development, property management, and the cannabis industry. My work has consistently emphasized transparency, ethics, and community-focused development.

2. I hold a double major in Accounting and Business Finance. I have four years of experience in public accounting and an additional four years in high-level corporate governance roles specializing in accounting and finance. Furthermore, I have over a decade of entrepreneurial experience in the real estate and cannabis industries.

3. This affidavit is provided in support of my federal complaint, which involves multiple individuals, entities, and organizations across various sectors, including real estate, government, law enforcement, healthcare, and the cannabis industry. Central to this dispute are **CHRISTOPHER AARON MILLER** and **UHCC, INC.,** whose coordinated efforts have caused significant harm to my professional standing and personal well-being.

4. **CHRISTOPHER AARON MILLER** has engaged in a series of deceptive practices, including attempting to coerce me into a predatory partnership agreement designed to strip me of autonomy while granting him full control. He has acted in bad faith by filing organizational documents that misrepresent my role, failing to provide proper agreements addressing my compensation, and attempting to defame me by falsely alleging illegal activity in my professional capacity. His actions have been aimed at marginalizing my contributions, obstructing my professional growth, and undermining my integrity.

5. Additionally, **CHRISTOPHER AARON MILLER** has been the beneficiary of millions of dollars in public funding, which has been marked with significant improprieties, misappropriation, and commingling of funds. This includes a $500,000 investment into **CAPRA BANK** of Dubuque, made through a project at **249 W. 1st St., Dubuque, IA 52001**, which itself has received public funding. Further compounding the impropriety, Mr. Miller is also the landlord for the **IOWA DEPARTMENT OF HEALTH AND HUMAN SERVICES** the state agency that regulates Iowa's Medical Cannabis program. This dual role presents a clear conflict of interest, as Mr. Miller directly benefits from a government agency responsible for oversight in an industry in which he is personally and financially invested. These actions highlight a troubling misuse of public resources for personal gain, while undermining the integrity of Iowa's medical cannabis regulatory framework.

6. **UHCC, INC.,** an Illinois-based cannabis company in which Mr. Miller has invested, has actively participated in efforts to suppress my whistleblower activities. Through its leadership, including influential figures within the cannabis industry and judicial systems, the company has worked in tandem with Mr. Miller to discredit my advocacy for transparency and accountability. Their combined actions include leveraging legal and financial resources to silence my efforts, perpetuate defamatory claims, and obstruct my attempts to expose unethical practices within the cannabis industry.

7. Together, **CHRISTOPHER AARON MILLER** and **UHCC, INC.** have engaged in compounded offenses, including:
   - **Defamation**: Disseminating false and harmful claims about my professional conduct to damage my reputation.
   - **Extortion**: Withholding rightful compensation with the threat of retaliation for activism.

- **Tortious Interference**: Intentionally disrupting my current and future business relationships by engaging third parties to discredit and isolate me professionally.
- **Deceptive Practices**: Misrepresenting terms of agreements, filing false documents, and withholding rightful compensation.
- **Whistleblower Suppression**: Coordinating efforts to stifle my advocacy for ethical practices within the cannabis industry, using influence and resources to silence me and obstruct my transparency efforts.
- **Misappropriation and Commingling of Public Funds**: Benefiting from public funding through projects marked by financial irregularities, including substantial investments into private enterprises like **CAPRA BANK,** without proper accountability.
- **Conflict of Interest**: Serving as the landlord for the **IDHHS**, the very agency that regulates Iowa's Medical Cannabis program, creating an untenable overlap between public regulatory responsibilities and personal financial interests.

8. These actions by **CHRISTOPHER AARON MILLER** and **UHCC, INC.**, compounded by their significant influence in real estate and cannabis sectors, have created substantial and ongoing harm to my career, reputation, and personal well-being. Their coordinated misconduct forms the foundation of this dispute, underscoring a pattern of behavior aimed at suppressing accountability and evading scrutiny.

## II. BACKGROUND AND PROFESSIONAL RELATIONSHIP WITH CHRISTOPHER AARON MILLER, JUDGE SHELLI HAYES, & UHCC, INC.

9. My professional relationship with **CHRISTOPHER AARON MILLER** began in or around March 2022. I was engaged by **MILLER** to assist in various real estate development and business management activities, including financial oversight, operational management, and project execution. My contributions were integral to the success of several of **MILLER**'s ventures, as I worked diligently and in good faith to ensure the success of these projects.

10. I first met **JUDGE SHELLI HAYES** in 2015 when we openly smoked a Cannabis blunt together on the street in Lincoln Park, Chicago, IL, while attending an Illinois Cannabis Industry event. We formed a connection and continued to collaborate professionally in the years that followed. In 2017, both **HAYES** and I relocated to Las Vegas, where we explored potential business opportunities in Nevada's burgeoning cannabis industry. Between 2018 and 2020, **HAYES** and I worked together on various ventures, with her facilitating introductions to business opportunities and collaborators.

11. My relationship with **HAYES** predates her principal role with **UHCC, INC.** In or around 2019, **HAYES** reached out to me seeking my assistance with raising local capital to apply for a cannabis license in Illinois' BLS 14 District, which included East Dubuque, IL. At that time, I was unable to contribute or find willing investors due to the risks associated with and cost of the application process.

12. In 2021, **JUDGE SHELLI HAYES** reached out to inform me that she had been awarded a license for the district and was working with **UHCC, INC.**, d/b/a **Bridge City Collective**, as a principal along with **DAVID ALPORT**. She requested my help in establishing operations, and we began loose negotiations around that time. I was formally engaged with them in August 2023.

13. In December 2023, I introduced **CHRISTOPHER AARON MILLER** and **UHCC, INC.** in a collaborative effort to reduce building costs for a project in East Dubuque, IL. I played an instrumental role in developing the relationship between the parties, negotiating key terms, drafting the Letters of Intent (LOIs), and acting as a liaison to ensure effective communication and alignment of interests.

14. Several months later, in or around May 2024, the two parties began their joint venture relationship. This partnership included a $2M+ development project, a **NNN lease** spanning 10 years, with a total rental income value of approximately $2.5M, and two additional 5-year renewal options.

15. As part of the agreement, **CHRISTOPHER AARON MILLER** committed to investing $250,000 through a convertible note to fund the operations of the East Dubuque, IL store. **DAVID ALPORT**, a principal of **UHCC, INC.**, made claims that this investment could yield a 4-5X return upon exit, underscoring the project's anticipated financial success.

16. Throughout this time, I continued to play a key role in facilitating the partnership between **MILLER** and **UHCC, INC.**, providing my expertise, professional network, and detailed negotiations to bring the project to fruition. Despite my contributions, **MILLER** began a campaign to marginalize my involvement once the deal was finalized, ultimately attempting to exclude me from meaningful participation in the project while coercing me into an administrative role with no decision-making power.

17. Additionally, **MILLER** made verbal promises of equity and/or bonuses for my efforts in putting the deal together. However, these promises were never honored. Instead, he sought to coerce me into signing a predatory partnership agreement that would strip me of autonomy and place him in full control.

18. The transaction closed in August 2023. At that time, I approached **MILLER** for compensation for the multi-million-dollar deal I had put together. It was then that **MILLER** began his campaign against me, escalating his efforts to undermine my professional credibility and exclude me from the project.

19. From May to September 2024, I began compiling information on **MILLER**'s financial improprieties, backing up all data onto thumb drives and a laptop with the intent to report his misconduct to the appropriate authorities. On September 11, 2024, the pressure finally culminated, and I decided to report **MILLER** to the **Iowa State Auditor** and **Iowa Finance Authority**. I spoke with a few trusted individuals, including an administrative staff member in **MILLER**'s office, about what was going on. Word of my intent got back to **MILLER**, who subsequently terminated my professional relationship with him.

20. In mid-September 2024, I formally filed a report with the **Iowa State Auditor's Office**, documenting the financial irregularities and improprieties I had uncovered.

21. Following my report, I received several threatening letters from **FLINT DRAKE**, **MILLER**'s attorney, to intimidate me and coerce me into silence.

## III. WHISTLEBLOWER ACTIVITIES AND RETALIATION

22. My efforts to address the financial and compliance irregularities I uncovered were undertaken in good faith and in alignment with state and federal laws protecting whistleblowers who report unethical or illegal conduct. I acted with the intent to hold **CHRISTOPHER AARON MILLER** accountable while adhering to legal and ethical standards.

23. From May to September 2024, I compiled evidence of **MILLER**'s financial improprieties, backing up all relevant information onto thumb drives and my laptop, intending to report his misconduct to the appropriate authorities. On September 11, 2024, after months of gathering information, I decided to formally report **MILLER** to the **Iowa State Auditor** and **Iowa Finance Authority**.

24. During this time, I made continued attempts to resolve the situation diplomatically with **UHCC, INC.** However, they also began to marginalize my contributions and downplay my involvement. Despite my efforts to discuss the matter with **JUDGE SHELLI HAYES**, she eventually began ignoring my calls, leaving me no choice but to terminate my relationship with **UHCC, INC.**

25. On October 11, 2024, **CHRISTOPHER AARON MILLER** filed a lawsuit against me, which I allege is a retaliatory action aimed at silencing my whistleblower activities and suppressing my efforts to expose potential misconduct.

26. On October 12, 2024, **DAVID ALPORT** of **UHCC, INC.** sent me a hold harmless agreement in exchange for the approximately $5,600 they owed me for consulting services. This was the only compensation I received for putting together the multi-million-dollar deal. Both parties signed the agreement on October 15, 2024, and **ALPORT** informed me that the check was in the mail.

27. On October 14, 2024, I filed a counterclaim as a **pro se** litigant in response to **MILLER**'s lawsuit. At this point, I had been left without compensation for my work, including **MILLER** withholding my final pay. With no legal training, I was forced to defend myself against his baseless allegations.

28. On October 22, 2024, I contacted **DAVID ALPORT** to follow up on the check, as it had not arrived. I was met with extreme hostility, which further escalated tensions.

29. **CHRISTOPHER AARON MILLER** escalated his retaliation by aggressively contacting my managing broker, **Kim Bussan**, making direct threats against my professional licensure. These actions caused significant emotional and financial distress, as they jeopardized my primary source of income and my ability to support myself and my family.

30. Throughout the legal proceedings, **Flint Drake**, acting as **MILLER**'s attorney, engaged in personal and unfounded attacks on my character. These tactics appeared designed to distract, discredit, and intimidate me, adding to the challenges I faced in defending myself.

31. Feeling increasingly cornered and under attack, I began engaging in public protests, including making online posts regarding **Bridge City Collective**. On October 26, 2024, I published the story my confidential friend helped me craft and began distributing paper copies to area establishments to bring awareness to the situation.

32. On October 27, 2024, **MILLER** filed criminal harassment charges against me, alleging that my online posts and distribution of the story constituted harassment, despite my having made no direct attempts to contact him.

33. I have no remorse and No Mens Rea for my actions, as this was the only recourse available to me at the time. I was under constant harassment from **MILLER**'s attorney, my financial resources were exhausted, and I had no other means of seeking accountability.

## IV. SYSTEMIC ABUSE AND PERSONAL MISTREATMENT

34. I have faced deeply troubling and systematic abuse, including wrongful detainment, forced hospitalization, and criminalization for cannabis use. My mistreatment began with unlawful

detainment and forced hospitalization and escalated into a raid on my home and criminal charges. My father, **THOMAS JOSEPH GOODMAN**, a former public defender and current "drug court" attorney, collaborated with the legal system to silence me, using fraudulent tactics to discredit me further.

35. On October 11, 2024, I called my father, **THOMAS JOSEPH GOODMAN**, and my aunt, **CATHERINE ANNE GOODMAN**, to meet me at St. Raphael's Cathedral in Dubuque, IA. I chose this location due to my deepening faith in Christianity and my family's long history with the church. Instead of being met with concern, I was met with extreme hostility by my aunt, **CATHERINE ANNE GOODMAN**, and dismissiveness by my father. Details of these interactions are documented in affidavits related to the mental health cases referenced in this complaint.

36. Despite this hostility, I continued to reach out to my father, **THOMAS JOSEPH GOODMAN**, seeking his assistance in my civil case. He continuously dismissed my requests for support, further exacerbating my sense of isolation and betrayal.

37. On October 30, 2024, I received an email from **FLINT DRAKE**, copying **JUDGE MICHAEL SCHUBATT**, proposing to move the original court date for my civil case to October 31, 2024, after initially delaying proceedings to December 5, 2024. I agreed to appear in court on October 31 at 10:00 AM.

38. After receiving notice of the rescheduled court date, I contacted my father, **THOMAS JOSEPH GOODMAN**, one last time to request his presence in court. His response to me was, *"They just want you to stop."* At the time, I did not fully understand the implications of this statement. Later, I realized that through this comment, my father was likely admitting to working with the other respondents.

39. Unbeknownst to me at the time, both **THOMAS JOSEPH GOODMAN** and **CATHERINE ANNE GOODMAN** had completed and submitted affidavits for my involuntary mental health commitment. These affidavits were rife with perjury and lies, falsely claiming I suffered from multiple mental health disorders and was abusing cannabis. This effort was a deliberate attempt to silence me and delegitimize my actions.

40. On October 31, 2024, I arrived at the **Dubuque District Court** at 8:30 AM to prepare for my case. As I was organizing my documents and preparing my arguments, I was suddenly surrounded by four sheriff's deputies and involuntarily transported to **MercyOne Hospital** in Dubuque.

41. While I was forcibly detained at **MercyOne Hospital**, my home was raided by local law enforcement and other unidentified individuals driving a vehicle with Ohio license plates. I have video evidence of the officers waiting to gain entry to my property. During this time, they made threats to "rile up my dogs," while another officer joked about tasering them. Upon eventually noticing my security cameras, the officers tampered with the cameras in an apparent attempt to obstruct documentation of their actions.

42. The officers never served me with a search warrant nor left any receipts or documentation for the items they seized. Among the items seized were my cellphone and computer, which I rely on to operate my business. This seizure significantly hampered my ability to earn income, as I was forced to purchase a new phone and computer, further draining my already limited financial resources. This also restricted my ability to respond effectively to the allegations against me.

43. Additionally, the seized devices contained sensitive client information, evidence related to my cases against **CHRISTOPHER AARON MILLER**, and investigative information for

Page **6** of 27

other ongoing matters. The loss of these items not only impacted my livelihood but also jeopardized the confidentiality of my professional work and evidence critical to my legal defense.

44. At the hospital, I was coerced into undergoing a mental health and substance abuse evaluation. Without my consent, I was forcibly diagnosed with **"Cannabis Use Disorder"** and **"Bipolar Disorder."**

45. I protested the evaluations and the diagnosis, fasting for six days to resist pharmaceutical intervention. Despite my protests, I was forcibly medicated with drugs that caused severe side effects and discomfort, including risks that could lead to life-threatening conditions.

46. My father, **THOMAS JOSEPH GOODMAN**, played a pivotal role in securing my forced commitment by signing the fraudulent affidavits used to justify the involuntary commitment. These documents, containing perjury and false claims, legitimized the forced hospitalization, the raid on my home, and the subsequent coercion I endured.

47. The legal documents signed by my father were weaponized against me, enabling the courts to strip me of my autonomy and forcibly confine me in a mental health facility. This abuse of power is part of a larger pattern of systemic corruption involving influential figures within the courthouse, local government, and mental health facilities.

48. These events represent a systematic effort to silence me, discredit my whistleblower activities, and suppress my ability to defend myself against **CHRISTOPHER AARON MILLER**'s retaliatory actions and the broader allegations outlined in this complaint.

## V. BROADER IMPLICATIONS AND SYSTEMIC INEQUITIES

49. **Arrival at MercyOne Hospital**
On October 31, 2024, at approximately 9:15 AM, I was involuntarily transported to MercyOne Hospital's emergency room in Dubuque, IA. I was detained against my will and understandably aggravated due to the circumstances. My mother, **Susan-Marie: Kearns**, went to the Dubuque District Courthouse first to retrieve my belongings and then came to the hospital to see me. However, hospital staff initially denied her access, preventing her from offering me any support during this distressing time.

50. **False Labeling as Suicidal**
Upon my arrival, I was labeled as "suicidal," despite never making any claims or expressing intentions to harm myself or others. This label was wholly fabricated and completely unsubstantiated. I have never been suicidal and continue to remain of sound body and mind, even under extreme duress. This false designation was used to justify my detainment and the coercive measures taken against me.

51. **Threats and Coercion**
After approximately an hour in the emergency room, hospital staff threatened to forcibly restrain me by strapping me to a bed and injecting me with pharmaceutical drugs unless I complied with their demands. Feeling cornered, I reluctantly complied under duress. However, I made it explicitly clear throughout the process that "**I DO NOT CONSENT**."

52. **Forced Medical Procedures**
Despite my lack of consent, hospital staff drew my blood and took a sample of my urine. Both actions violated my bodily autonomy and my deeply held spiritual beliefs. According to my faith, my blood and urine are sacred. These actions were taken against my explicit objections and without any legitimate justification.

**Blood is Sacred**

- **Leviticus 17:11**

  *"For the life of the flesh is in the blood, and I have given it for you on the altar to make atonement for your souls, for it is the blood that makes atonement by the life."*

  o This verse highlights the sacred nature of blood, emphasizing its connection to life and spirituality.

- **Genesis 9:4**

  *"But you shall not eat flesh with its life, that is, its blood."*

  o This demonstrates the biblical view of blood as containing life and being sacred, further underscoring its sanctity.

- **Deuteronomy 12:23**

  *"Only be sure that you do not eat the blood, for the blood is the life, and you shall not eat the life with the flesh."*

  o Blood is directly associated with life and should be treated with reverence.

**Bodily Autonomy and Integrity**

- **1 Corinthians 6:19-20**

  *"Do you not know that your body is a temple of the Holy Spirit within you, whom you have from God? You are not your own, for you were bought with a price. So glorify God in your body."*

  o This verse supports the sanctity of one's body and the responsibility to protect it as a divine temple.

- **Romans 12:1**

  *"I appeal to you therefore, brothers, by the mercies of God, to present your bodies as a living sacrifice, holy and acceptable to God, which is your spiritual worship."*

  o The body is considered holy and should not be subjected to defilement or unwanted interventions.

**Purity and Sacred Fluids**

- **Psalm 139:14**

  *"I praise you, for I am fearfully and wonderfully made. Wonderful are your works; my soul knows it very well."*

  o This verse underscores the inherent sanctity of the human body as God's creation.

- **Job 10:8-9**

  *"Your hands fashioned me and made me, and now you have destroyed me altogether. Remember that you have made me like clay; and will you return me to the dust?"*

  o The body is a divine creation and should be respected as such.

These verses reinforce my belief in the sacredness of your body, blood, and bodily fluids, and can be used to argue against the forced medical procedures I underwent.

53. **First Interaction with DR. ADIB KASSAS on November 1, 2024**
    On November 1, 2024, I was forced to undergo a mental health evaluation conducted by **DR. ADIB KASSAS** in the presence of a nurse and another witness. This evaluation was performed without my consent and under duress.

54. During the evaluation, **DR. ADIB KASSAS** appeared lethargic and disinterested. He was visibly pale, morbidly obese, and repeatedly yawned throughout the interaction, which gave

the impression that he was either physically unwell or unprepared to conduct a thorough analysis of my mental health. This demeanor further demonstrated a lack of professionalism and respect for the gravity of the situation.

55. I attempted to explain my circumstances, including the false accusations and fabricated claims that led to my detainment. Instead of addressing my concerns, **DR. ADIB KASSAS** repeatedly interrupted me, dismissed my statements as irrelevant, and reframed my resistance to their actions as evidence of mental instability.

56. When I asserted that I was of sound mind and body, **DR. ADIB KASSAS** responded condescendingly, suggesting that my refusal to comply with their interventions indicated a deeper psychological issue. I reiterated my lack of consent and my faith-based objections to the forced medical interventions, but my protests were ignored.

57. Additionally, **DR. ADIB KASSAS** made comments suggesting that my advocacy and whistleblowing activities were delusional or symptomatic of paranoia. These comments demonstrated a clear bias against my perspective and reinforced their pre-determined conclusions about my mental state.

58. As the evaluation concluded, I directly asked **DR. ADIB KASSAS** what he was thinking about my condition. He hesitated for a moment before inquisitively stating, *"I'm thinking Bipolar."* This remark was speculative and unprofessional, demonstrating a lack of conclusive evaluation and a predisposition to label me without sufficient evidence or proper context.

59. The evaluation ended with **DR. ADIB KASSAS** insisting on a course of pharmaceutical treatment, which I vehemently opposed. Despite my protests, I was informed that the treatment would proceed regardless of my consent.

## VI. EVENTS BETWEEN NOVEMBER 1, 2024 – NOVEMBER 4, 2024

60. Between November 1, 2024, and November 4, 2024, I remained steadfast in my position that I was being involuntarily detained against my will for political retaliation. I repeatedly asserted that I was a free, living man and that my detainment was unlawful. I communicated this belief clearly to nurses, doctors, orderlies, and other patients, ensuring they understood the nature of my situation.

61. On November 1, 2024, while student nurses were observing the ward, I took the opportunity to inform them of my position and situation. I made clear that my detainment was unlawful, politically motivated, and a violation of my rights. I insisted that they document my statements in their notes to ensure there was a record of my objections.

62. Throughout my stay, I made several submissions into my medical chart, explicitly providing notice to hospital staff that I was not mentally incapacitated. I declared my sound mind and body and repeatedly expressed my refusal to consent to the detainment or any medical interventions.

63. During this time, I observed shocking and unethical behavior by the staff. I witnessed **DR. ADIB KASSAS** and other doctors engage in what I would describe as coercion of power over patients. Patients with lesser mental faculties were forcibly subdued and "beaten into submission" through excessive use of drugs.

64. I also noted the staff's use of coercion through reward systems that preyed on patients' vulnerabilities. These "games" exploited the patients, manipulating them into compliance in exchange for trivial rewards or privileges.

65. From my observations, approximately half of the staff genuinely cared for the well-being of the patients. They exhibited compassion and a sincere desire to help. However, the other half displayed sadistic tendencies, seemingly enjoying the control and power they held over the patients. Their behavior was cruel and oppressive, exacerbating the suffering of those under their care.

66. From October 31, 2024, through November 4, 2024, I fasted as an act of protest against my unlawful detainment and the blatant violation of my religious freedoms and rights. I consistently informed the staff that my fasting was a symbolic rejection of their authority, as I would not accept offerings from tyrants or agents of tyranny. My fasting was a physical manifestation of my resistance to the injustice I was enduring.

67. It was not until November 2, 2024, that I was informed of criminal charges against me. I was told that I was being held under the Ed Thomas Law (cite source) and that I would be released into police custody to be booked at the jail. Due to these charges I was not allowed to have visitors or other privileges that most patients had, like access to cellphones.

68. The charges included "Harassment in the 3rd degree" and "Unlawful Access of Computer." I believe these charges were fabricated by **CHRISTOPHER AARON MILLER** as part of his ongoing efforts to discredit my whistleblowing activities and suppress the evidence I had collected regarding his misconduct. These accusations were yet another retaliatory measure aimed at silencing me and further damaging my reputation.

**VII. EVENTS OF NOVEMBER 4, 2024**

69. On the morning of November 4, 2024, I was first informed that **DANIEL DLOUHY** had been appointed as my counsel. I was not consulted about this appointment, nor did I consent to his representation.

70. Later that morning, I received a phone call from **DANIEL DLOUHY**, but I chose not to answer.

71. **DANIEL DLOUHY** called a second time, and I accepted the call. I explained the situation to him, made clear that I was rejecting his representation, and requested that he withdraw from the case. I emphasized that I did not consent to his involvement and that his participation was not representative of my interests or wishes. **DLOUHY** informed me that the court would likely not allow him to detach from the case, effectively disregarding my denial of his counsel.

72. Shortly after, I received a phone call from the hospital administration office asking how I intended to pay for my stay and requesting insurance information. I informed them that I am endowed by the Creator, I have no insurance, and, as I was involuntarily detained, I was not liable for any charges. The administration responded by stating that "the hospital would pay for my care."

73. I wrote out an affidavit stating that I am a living man and not the legal fiction of **AUSTIN ANDREW GOODMAN**, which the courts were using to deprive me of my constitutional rights. I had the hospital's chaplain notarize several copies of this affidavit and ensured one was added to my medical chart prior to the scheduled hearing.

74. I asked all public servants involved in my case to fill out a public servant questionnaire, which all of them denied. I informed the staff and authorities that I would refuse to attend the hearing until all public servants completed the questionnaire.

75. I did not attend the hearing. My mother attempted to attend the hearing, which was held via Zoom, but she was denied access.
76. I was informed that the hearing proceeded without my participation. **DANIEL DLOUHY** made no effort to defend my rights during the hearing.
77. During the hearing, I was fraudulently diagnosed with "Bipolar Disorder" and "Cannabis Use Disorder." Orders were issued to administer intermuscular injections of pharmaceuticals if I resisted oral drugs, along with directives for further forced hospitalization.
78. Respondents present at the hearing included the **JUDGES, PATIENT ADVOCATE NANCY FISCHER**, the **COUNTY ATTORNEY'S OFFICE, DANIEL DLOUHY, THOMAS JOSEPH GOODMAN**, and **CATHERINE ANNE GOODMAN**.
79. All of these parties conspired to harm me with pharmaceuticals and to detain me against my will, using their positions of power and influence to violate my rights.

## VIII. EVENTS OF NOVEMBER 5, 2024

80. On the morning of November 5, 2024, I awoke and proceeded to the common area. At approximately 10:00 AM, I was approached by **DR. ADIB KASSAS**, who informed me in a sadistic, condescending, and disturbing manner that he would begin administering **LamoTRIgene** to me. He further stated that if I resisted the oral dosage, I would be injected with what he described as "much worse."
81. I immediately informed **DR. ADIB KASSAS**, in the presence of my nurse **Brooksy**, that *I DO NOT CONSENT*. I stated that this action constituted assault and that he was poisoning me with a neurotoxin. To my shock, **DR. ADIB KASSAS** acknowledged my objection and confirmed that his intent was to proceed regardless.
82. When I vehemently objected to this treatment, **DR. ADIB KASSAS** attempted to justify his actions by claiming, *"But the courts ordered me,"* as though this absolved him of responsibility for the harm he was doing. I reminded him that he was violating his **Hippocratic Oath** and duty of care, but he dismissed my objections without concern.
83. They attempted to administer **LamoTRIgene**, but I initially resisted. I was not provided with any form of informed consent, nor was I given a list of adverse side effects or ingredients until I demanded them. Nurse **Brooksy** eventually provided a handout and looked up the ingredients, which were not included in the provided material. She gave me until 12:00 PM to review the information.
84. Upon reviewing the materials, I was again approached by **Brooksy**, who informed me that if I refused the oral tablet, I would be injected with what she reiterated was "much worse." I questioned why, if this treatment was supposed to be for my benefit, I was being threatened with increasingly harmful pharmaceuticals. **Brooksy** did not provide a satisfactory answer.
85. At 12:00 PM, under coercion and against all objections, I was forced to take 25mg of **LamoTRIgene**. This was administered despite my lack of consent and in the absence of sufficient information regarding the potential risks or alternatives.
86. At the time I was coerced into taking the medication, I had been fasting for six days as a protest against my unlawful detainment and violation of my religious freedoms. Approximately 15 minutes after taking the tablet on an empty stomach, I experienced a severe ache on the left side of my abdomen.

87. Roughly 30 minutes later, I developed a migraine headache focused on the left side of my temporal lobe. These symptoms were immediate and concerning side effects of the **LamoTRIgene**, highlighting the potential harm caused by this forced administration.

88. Shortly after taking the LamoTRIgene, I vomited, expelling mostly water, a light film of stomach acids, and potentially some of the drug itself.

89. Following the vomiting episode, I experienced extreme dizziness that lasted approximately 30 minutes. This marked the first instance of illness I had felt in years, and it was very clearly a direct reaction to the medication.

90. My judgment soon became cloudy, and I felt unusually irritable. I was unable to concentrate as I attempted to study and document my experience. The mental fog made it extremely difficult to focus, write, or think clearly. This persisted for about two hours, after which I regained full consciousness.

91. I reported these adverse effects to Nurse **Brooksy**, who stated that she would document them in my medical chart.

92. Due to the nausea and other negative side effects I was experiencing, I decided that I should eat something in an attempt to dilute the drugs in my system and alleviate my symptoms.

93. That evening, I had dinner and ate some popcorn. The food appeared to lessen the severity of my symptoms, providing slight relief from the dizziness, nausea, and cloudiness I had been experiencing throughout the day.

94. It is important to note that the food served at MercyOne did not meet my dietary needs or standards. The meals were filled with artificial ingredients, fat-free products, and reduced sodium options, all of which go against the strict dietary regimen I have developed over years to support my health. Despite my requests, the hospital was unable to provide food that adhered to my specific dietary requirements.

95. Sometime between 7:30 and 9:00 PM, I was coerced into taking another 25mg dose of LamoTRIgene. Before administration, I informed Nurse **Lauren** of the negative side effects I had experienced earlier in the day. Despite my concerns, Nurse Lauren appeared indifferent and proceeded with the administration. Under duress, I took the second dose.

96. I felt sick, but shortly thereafter fell asleep.

## IX. EVENTS OF NOVEMBER 6, 2024 – NOVEMBER 12, 2024

97. At the time of writing this affidavit, I cannot locate my notes from November 6, 2024, but I do recall some of the events.

98. On November 6, 2024, I was given another dose of **LamoTRIgene**, despite having explicitly told my nurse that morning that the medication was making me ill. The rest of the day, I was unable to concentrate or focus. This was especially distressing for me as I am typically sharp-witted and value being in control of my mind and body.

99. On the morning of November 7, 2024, I had an interaction with **DR. ADIB KASSAS**. Although I continued to deny him consent to treat me, I informed him that the **LamoTRIgene** was making me feel sick. His response was dismissive and accusatory, as he stated, *"I think you're lying."*

100. At approximately 9:00 AM that same morning, I was administered another dose of **LamoTRIgene**. About 30 minutes later, **James Luksetich**, a familiar face from my past, entered the ward. He had been my grade school guidance counselor and chaplain.

101. During our conversation, we discussed cannabis and other entheogens as sacrament and Eucharist. However, as we talked, I began to feel increasing nausea. My brain became clouded, I grew dizzy, and my ability to concentrate was severely impaired.

102. I directly informed **DR. ADIB KASSAS** that I was being assaulted with a pharmaceutical. He acknowledged my statement, responding simply, *"You're right."* This interaction took place in front of Nurse **Brooksy**. I asked **Brooksy** to document **DR. ADIB KASSAS**'s acknowledgment in my medical chart, and she stated that she did.

103. Approximately 15 minutes after this interaction, I experienced numbness throughout my body and mind. This numbness persisted for several hours and further exacerbated my inability to function or focus.

104. On the evening of November 7, 2024, at approximately 9:00 PM, I was approached by two nurses and two security personnel. They required me to ingest 25mg of **Quetiapine** and **SEROquel**, threatening escalation to an injection of what they described as "much worse" if I refused.

105. I put them on notice, informing them that I did not consent and that their actions constituted assault with a pharmaceutical intended to injure me. They acknowledged my statement but proceeded regardless. To avoid experiencing the negative effects of this drug or the cumulative effects of the three different pharmaceuticals already in my system, I noted that I would try to go to sleep immediately after ingesting the medication.

106. I fell asleep and, to my recollection, did not feel significantly ill during the night. I slept heavily through to the next morning.

107. On the morning of November 8, 2024, at approximately 9:00 AM, **DR. ADIB KASSAS** informed me that he was increasing my "medicine." I objected, expressing that I was experiencing severe side effects, including significant constipation—I had not defecated in 48 hours, which is extremely rare for me. I told **DR. ADIB KASSAS** that he was willfully ignoring my concerns and escalating harm. I expressed deep concern about the increased dosage, emphasizing my fears of further adverse effects.

108. I was once again forcefully instructed by three nurses to ingest LamoTRIgene, with the continued threat of being injected if I refused. Reluctantly and under coercion, I complied.

109. About 30 minutes after taking the medication, I experienced a sudden and abrupt inability to complete thoughts or sentences. My mind became cloudy, and I began to lose control over my left arm. The symptoms were alarming and clearly a cumulative effect of the pharmaceuticals forced upon me.

110. That morning, I became extremely irritable and angry, expressing my frustration and anger toward several nurses in an outburst.

111. I noted my profound distress and anger at **DR. ADIB KASSAS**, whom I accused of committing a hate crime against me by intentionally poisoning my mind and body with a neurotoxin designed to injure me and disrupt my thoughts and spirituality. I made it clear that his actions were not only harmful but also a deliberate attempt to suppress my autonomy and spiritual integrity.

112. On November 10, 2024, I continued to feel spiritually and mentally drained but began to experience a renewed determination to work on my case. I realized that I had 10 days to appeal the hearing from November 4, 2024, and focused my efforts on preparing rebuttals and documentation. Despite my limited access to resources, I spent most of the day working diligently on my appeal.

113.    On November 11, 2024, my focus remained on preparing my case. I worked on my rebuttals for the appeal, continuing to face significant challenges due to the lack of tools and materials available to me.

114.    Later that day, in honor of Veterans Day, I watched several documentaries about veterans. This was a moment of reflection and respect for the service and sacrifices of military personnel. My grandfather, a retired Lt. Col. in the Army Corps of Engineers, and my uncle, a retired Chief Petty Officer in the Navy who also served over 10 years with the Birmingham, AL Police Department, have instilled in me a deep appreciation for our servicemen and women.

115.    On November 11, 2024, in the morning, **DR. ADIB KASSAS** approached me and aggressively, yet jokingly, asked, "Are you ready to go to jail?" I informed him that I was working on my appeal and expressed concern about the unfairness of being forced to simultaneously fight criminal charges while dealing with my involuntary detainment. Despite my efforts, I remained in custody at **MercyOne** that day and continued working on my case as best as I could.

116.    On November 12, 2024, in the morning, **DR. ADIB KASSAS** approached me again in the common area in the presence of Nurse Megan. I confronted him about changing my drug regimen without informing me. He claimed that his lack of communication was because I refused to talk to him, which I pointed out did not absolve him of his professional duty to inform me of changes to my care.

117.    I then asked **DR. ADIB KASSAS** how he arrived at the diagnosis of "Bipolar." He explained that his decision was based on the affidavits submitted to the court and observations from the hospital staff. I challenged the validity of these observations, questioning how the input of unqualified individuals could form the basis of a serious diagnosis.

118.    **DR. ADIB KASSAS** responded by stating that he was "required by the courts" to provide a diagnosis.

119.    **DR. ADIB KASSAS** informed me that I would be released into police custody later that day.

120.    Just prior to my release, I was informed that I was additionally being charged with "Marijuana Possession, 1st Offense" and "Marijuana Paraphernalia" charges. I was also informed that these charges had been added retroactively on November 1, 2024.

121.    At approximately 12:00 PM on November 12, 2024, I was released into police custody.

## X. EVENTS OF NOVEMBER 12, 2024 – NOVEMBER 13, 2024

122.    On November 12, 2024, I arrived at the jail and was booked into custody. I spent the night in a room with deplorable conditions. The food provided was the most disgusting I have ever eaten in my life, entirely inedible by any reasonable standard.

123.    The jail conditions were horrific. I was provided with a mat that reeked of urine and body odor and an itchy wool blanket that offered little comfort.

124.    Since my forced removal from court on October 31, 2024, I had been forcibly committed and detained in the hospital. Upon my release from MercyOne, I was given back the same clothes I had worn when I was dragged out of court—a very nice suit. I was released into jail custody still wearing this suit, which was entirely inappropriate for the cold, harsh conditions of the jail cell.

125. I spent approximately 18 hours in the jail wearing my dress clothes while enduring the cold environment and harsh fluorescent lighting. Anyone who has spent even one night in jail can understand the misery of these circumstances. The experience was degrading and physically uncomfortable, highlighting the inhumane treatment I was subjected to throughout this ordeal.

126. The next morning, on November 13, 2024, I was released from jail on a signature bond. As part of the court's orders, I was required to comply with the mental health findings, which included continuing the pharmaceuticals I had been coerced into taking at MercyOne Hospital.

127. Immediately upon my release, I discarded the pharmaceuticals by depositing them into the amnesty box at the police station. I do not adhere to mandates regarding my health that conflict with my beliefs, and I do not consent to taking pharmaceuticals.

## XI. EVENTS OF NOVEMBER 14, 2024 – NOVEMBER 18, 2024

128. On November 14, 2024, I went to the **Dubuque County District Court** and filed my appeals with the Clerk of Court. This was the final day to appeal the court's findings from November 4, 2024, and I ensured the necessary documentation was submitted within the deadline.

129. After filing the appeals, I spent the rest of the day cleaning up my appearance. Due to the events of my confinement, I had been left disheveled and unable to maintain my usual grooming routine. Anyone who knows me understands that I take great pride in my appearance—I am always immaculately dressed, well-groomed, and sharp. Restoring my neat appearance was both a practical and symbolic act of regaining control.

130. I then visited **Verizon Wireless** to purchase a new cellphone, as the police still have my cellphone and computer in custody following the raid on October 31, 2024. This forced purchase was another financial strain, further depleting my resources during an already difficult time.

131. Compounding the financial burden, I had not backed up my iCloud storage for several years, resulting in the permanent loss of critical conversations, photographs, and other data vital to both my business and evidence for my legal cases.

132. Upon reconnecting with my real estate clients, I discovered that my two primary customers had dropped me as their representative due to my inability to attend to their needs while I was confined. This loss of clients added to my financial duress and heightened the overall stress of the situation.

133. On November 14, 2024, I also drafted an affidavit documenting the events of October 11, 2024, at the church. This affidavit highlighted the confrontational and hostile interactions that contributed to the fraudulent affidavits submitted by **THOMAS JOSEPH GOODMAN** and **CATHERINE ANNE GOODMAN**.

134. Additionally, on November 14, 2024, I drafted a motion for discovery related to the search and seizure conducted on October 31, 2024. Both this motion and the affidavit for the church events were submitted to the Clerk of District Court on November 15, 2024.

135. Over the weekend of November 16–17, 2024, I focused on regathering my thoughts and prioritizing my legal efforts. I drafted motions for discovery in both my mental health and criminal cases, as well as a motion for discovery regarding the search and seizure conducted during the raid on October 31, 2024.

136. On November 18, 2024, I filed these motions with the Clerk of District Court. To date, neither the courts nor any of the involved parties have responded to these motions, leaving significant aspects of my case unresolved.

## XII. EVENTS OF NOVEMBER 18, 2024 – NOVEMBER 26, 2024

137. While I was confined, my mother managed to back up the video surveillance footage from my **ARLO security system**, despite the tough communication and technical barriers we faced. She was able to save most of the video footage, although some segments were lost.

138. On November 18, 2024, my mother shared the video files with me. Upon reviewing the footage, I became seriously aggravated by the misconduct of the officers involved.

139. The most disturbing segments included:
    1. One officer commenting, *"I'm going to go see if I can get the dogs riled up and get them to bust through the door."*
    2. A uniformed officer responding, *"Hey, dry stun act is in effect for humans, but doesn't say anything about animals,"* implying a threat to agitate and taser my dogs.

140. Another video showed one of the officers dismantling my security camera to stop further surveillance of their misconduct.

141. After reflecting on the events, I decided to post both videos on Facebook to bring attention to the unfair treatment I had been receiving and to hold the officers accountable. Within 24 hours, the video gained significant traction, receiving over 5,000 views and numerous comments. As of November 29, 2024, the video of the officers threatening my dogs has been viewed over 21,000 times and has garnered more than 100 comments.

142. Many people shared the videos on their own pages. Some of these individuals reported receiving anonymous threats from burner cellphones demanding that they take down the videos. I collected evidence of these threats and shared them on my page as well.

143. On November 18, 2024, an article was shared on the **@LegalizeItIowa** Facebook page highlighting the events of what happened to me. A page I started back in 2017 to chronicle the corruption in Iowa's cannabis market.

144. On the same day, I made a post on my personal Facebook page calling for action against **CHRISTOPHER AARON MILLER**'s improprieties. In the post, I tagged the **Governor of Iowa**, the **City of Dubuque**, and the **Dubuque Police Department**.

145. On November 20, 2024, I received a call from the **Dubuque Police Department**, informing me that my post allegedly violated my **Non-Contact Order** with **CHRISTOPHER AARON MILLER**. I explained that my post did not constitute contact with Mr. Miller and was protected under my **First Amendment** right to free speech. The officer stated that **County Attorney Scott Nelson** believed it was a violation and suggested that a warrant for my arrest might be issued.

146. Later that evening, while I was taking a bath at approximately 8:30 PM, my mother, who lives a few houses down the street, called to inform me that two police cars were parked at either end of the street, and officers were approaching my house from both sides.

147. I quickly got out of the bath and hid my dogs in my bedroom. The officers made several attempts to get me to answer the door, all of which were captured on my surveillance system. I later posted the footage online.

148. I also observed the officers standing across the street in front of my house for over 30 minutes on my street-facing camera. Eventually, they left without making contact.

149. Due to the judicial prejudice, continued harassment from law enforcement and the **County Attorney's Office**, and the growing attention my case was receiving, I decided to flee the state for my safety and the safety of my dogs.

150. On the night of November 20, 2024, I packed my belongings and loaded my car. On the morning of November 21, 2024, I fled the state. My decision was driven by fear for my life and safety, as well as financial constraints that would make it impossible to post bail if arrested, leaving me unable to work on my cases.

151. On November 22, 2024, I arrived at a safe location. Although the accommodations were far from ideal—I was sleeping on the floor in hiding—it was the only option available to me. The strain of travel and poor living conditions began to take a toll on my physical health.

152. To continue working on my case, I purchased a cheap laptop from Walmart for $350, further depleting my already strained financial resources.

153. Over the weekend of November 23–24, 2024, I began settling in and dealing with the illness my dogs contracted from eating cat feces at my destination. Despite these challenges, I focused on preparing my defense against the **Serious Misdemeanor Criminal Cannabis Charges** filed against me.

154. On November 25, 2024, I finalized a **Motion to Suppress and Dismiss** my case and filed it. I also submitted a motion requesting to attend my **November 26, 2024** hearing remotely.

155. On November 26, 2024, I called the court one hour before my scheduled hearing, as I had not received any response regarding my Motion to Attend Remotely.

156. During this call, Judge Robert Richter informed me that an extension for the hearing had been granted, rescheduling it to December 10, 2024. However, he insisted that I must attend the hearing in person, denying my request to participate remotely.

## XIII. THE FEELING OF IMPROPRIETY AND NEPOTISM IN THE DUBUQUE COUNTY COURTHOUSE, CONTRIBUTING TO JUDICIAL BIAS AGAINST MY POLITICAL CHARACTER

157. On November 20, 2024, **ATTORNEY FLINT DRAKE** filed additional motions to continue the civil case.

158. In response, I filed a motion requesting the suspension of the civil case.

159. This request was based on the fact that I am concurrently fighting **criminal charges** and addressing **civil mental health cases**, which have significantly strained my ability to defend myself effectively.

160. My motion included detailed complaints regarding **judicial prejudice** and the appearance of collusion between **JUDGE MICHAEL SHUBATT, FLINT DRAKE,** and **CHRISTOPHER AARON MILLER**, particularly surrounding the events of my forced removal and involuntary commitment on October 31, 2024.

161. On November 26, 2024, I received a **USPS Informed Delivery** notification indicating that mail from the **Dubuque District Court** was on its way.

162. On November 28, 2024, my mother retrieved the mail, which included court orders file-stamped for November 22, 2024.

163. These orders required me to attend a **mental health hearing** related to my appeals of the **substance abuse case** and the **serious mental impairment case**.

164. However, the orders were flawed, inaccurately labeling both cases as **serious mental impairment**, further evidencing a lack of care and accuracy in court documentation.

165.    The parties listed for electronic service in the orders included:

- **COUNTY ATTORNEY**.
- **DANIEL ALLEN DLOUHY**, falsely named as my representative despite my repeated denials of his counsel.
- **JOSHUA ARTHUR VANDERPLOEG**, whose involvement in my case remains unexplained.
- **NANCY FISCHER, PATIENT ADVOCATE**, who has failed to make contact with me since I presented her with my **Public Servant Questionnaire** after the hearing on November 4, 2024.

166.    On November 29, 2024, I left a voicemail for **DANIEL ALLEN DLOUHY**.

167.    I requested that he detach himself from my case. I also asked for instructions on how to remove him as counsel. Despite my efforts, I have received no response from **DANIEL ALLEN DLOUHY**.

168.    To further compound my emotional duress, the orders were signed by **JUDGE MICHAEL SHUBATT**, whom I believe to be a central figure in systemic judicial prejudice and bias.

169.    My father's decades-long career in the **Public Defender's Office**, combined with **FLINT DRAKE'S STANDING** in the legal community, creates an environment of impropriety and nepotism.

170.    This bias is evidenced by the clear collusion between **JUDGE SHUBATT**, the **COUNTY ATTORNEY'S OFFICE**, and other involved parties.

171.    As of November 29, 2024, I have yet to receive any response regarding my **motions for discovery**.

172.    This continued lack of action further denies me my rights to due process and transparency. I firmly believe this is an intentional effort to deprive me of my civil rights and to cover up **CHRISTOPHER AARON MILLER'S** misconduct.

173.    The combination of **judicial prejudice**, collusion, and nepotism has created an environment where my political character and whistleblowing activities have been weaponized against me.

174.    This systemic bias has undermined my ability to seek fair resolution in both my civil and criminal matters. It has contributed significantly to my emotional and financial duress.

## XIV. MR. MILLER'S EXPLOITATION OF CANNABIS AND DOUBLE STANDARDS

175.    It is evident that **CHRISTOPHER AARON MILLER** has no guilty conscience about exploiting the cannabis industry for his personal financial gain, yet he remains terrified of being associated with cannabis consumers.

176.    In **FLINT DRAKE'S** intimidation and termination letter dated September 12, 2024, he wrote: *"Finally, Chris has now learned that you regularly and illegally smoked marijuana while on the job and is concerned about any company exposure to claims related to this activity. He is also concerned about your ability to have performed your work adequately and consistent with requirements if in fact you smoked marijuana daily."*

177.    This statement is both laughable and hypocritical. While criticizing my personal use of cannabis—which I attest occurred no more than five times on the job over 18 months—

**CHRISTOPHER AARON MILLER** is an active investor and landlord in the cannabis industry through **UHCC, INC., d/b/a Bridge City Collective** in Illinois.

178. When I first began working for **CHRISTOPHER AARON MILLER** and his companies in early 2023, his primary tenant at 790 Main St., where his development and property management offices are located (and where I worked most of the time), was River Bluff Cannabis. This East Dubuque, IL-based cannabis company operates under the Farm Bill (CBD products) and owns and operates an Illinois-regulated dispensary and craft grow facility.

179. While **CHRISTOPHER AARON MILLER** uses my personal cannabis use to discredit me, he continuously exploited my work for his personal financial gain. This is especially true regarding the East Dubuque "marijuana" dispensary business, where he serves as both landlord and investor.

180. In the same letter, **FLINT DRAKE** claimed that no broker/client relationship existed between myself and **CHRISTOPHER AARON MILLER**, and therefore **CHRISTOPHER AARON MILLER** owed me no commission. While this may technically be true, as I was not licensed in Illinois at the time (though I previously was), it does not absolve **CHRISTOPHER AARON MILLER** of his deliberate exploitation of my work.

181. The letter further states: *"In this case you worked for Chris' company and made him aware of the dispensary business. Thereafter, Chris' ingenuity and initiative drove the transaction that resulted."* This statement is patently false. **CHRISTOPHER AARON MILLER** manipulated me with verbal promises of equity and bonus compensation, which he never intended to fulfill.

182. Upon leaving **CHRISTOPHER AARON MILLER**'s company, I sent an email to Creed J. Waelchli, an Assistant Vice President in the Specialized Insurance Division at **Cottingham & Butler**, located next to **CHRISTOPHER AARON MILLER**'s office on Main Street, Dubuque, IA. In this email, I inquired whether they provide insurance to cannabis-based businesses, including dispensaries. Mr. Waelchli's response confirmed that they do, and I reasonably assume they cover **CHRISTOPHER AARON MILLER**'s investment in Illinois.

183. In late August or early September 2024, **CHRISTOPHER AARON MILLER** told me about attending a private party at **ANDREW BUTLER'S** residence, a fundraiser for the **Dubuque Iowa GOP** and current candidates. Notably, **GOVERNOR KIM REYNOLDS** was in attendance, and Mr. Butler was upset that her schedule publicly listed his private address. He arranged for the **Dubuque Police Department** as security to monitor the event. During the party, **CHRISTOPHER AARON MILLER** had a private conversation with the Governor in Mr. Butler's presence, securing her personal cellphone number.

184. **CHRISTOPHER AARON MILLER** later used this access to the Governor as a tool to intimidate me. He told me about obtaining her number, quoting the Governor as saying, *"You have that in case I need to know of something going on. I can't do anything if I don't know of something going on."*

185. **CAPRA BANK**, a significant financer of development projects in Dubuque, IA, provides financing for **CHRISTOPHER AARON MILLER**'s real estate projects, include the dispensary project in East Dubuque, IL. Although **CAPRA BANK** claims they are not directly funding the dispensary, they are providing loans to **CHRISTOPHER AARON MILLER** against his other assets, knowingly supporting his dispensary business.

186. I set up the QuickBooks file for 128 Sinsinawa, LLC, the Iowa LLC invested in the East Dubuque dispensary property, and connected it to **CAPRA BANK**. **CAPRA BANK** appears to want to keep their involvement in cannabis discreet. While they prominently display their signage on other projects in the area, their branding is notably absent from the East Dubuque dispensary project.

187. I witnessed **CAPRA BANK**'S awareness of the dispensary business firsthand. During a private meeting between **CHRISTOPHER AARON MILLER** and **CAPRA BANK** representatives in our office, I casually mentioned the dispensary in conversation. It is clear they are fully aware they are financing a cannabis dispensary.

188. **CHRISTOPHER AARON MILLER** appears to be part of a racketeering organization aimed at limiting competition for personal gain. His financial activities exploit taxpayer resources while undermining fair market competition.

## XV. HISTORICAL PREJUDICE BY THE RESPONDENTS TOWARD AUSTIN GOODMAN AND HIS COMPANIES

189. In 2017, I was approached by a long-time friend I knew through rugby to start a CBD-based cannabis company operating under the 2014 Farm Bill, with the anticipation that the 2018 Farm Bill would provide additional opportunities and protections for interstate commerce.

190. My associates raised approximately $500,000 in capital to launch a Farm Bill-regulated CBD company. We established an Iowa LLC named American Standard Hemp Co., LLC and opened a bank account at **DUPACO CREDIT UNION**, where I had been a member since the age of 7. Although I had left the credit union when I moved to Chicago in 2008, I returned to utilize their services for this venture.

191. The company relocated to Colorado to begin operations and started deploying capital. By mid-2018, as the company began generating revenue, **DUPACO** contacted us and informed us that, under pressure from the **National Credit Union Association** (NCUA)—headed at the time by **JIM NUSSLE**—they would no longer support our business.

192. **DUPACO** gave us only one week to remove our capital from the bank, which caused massive operational disruptions.

193. We were flagged by other banks, making it difficult to open new accounts.

194. Revenue was disrupted as we could no longer collect receipts, leading to significant internal operational issues and a loss of confidence among partners and investors.

195. Later in 2018, I received a call from **THOMAS JOSEPH GOODMAN**, my father, who was actively practicing yoga at B-1 Yoga in Dubuque, IA. The proprietor at the time expressed interest in starting a CBD product line to supplement income and support her yoga practitioners' practices.

196. I invested significant time and resources working with B-1 Yoga Studio to develop products tailored to their needs and successfully secured them as a client.

197. In 2019, I traveled to Dubuque to attend a yoga class and deliver products, which were met with tremendous interest—particularly for our newly developed salve.

198. Shortly after this success, B-1 Yoga and other stores in Dubuque received a threatening letter from **CHIP MAY**, then **DUBUQUE COUNTY ATTORNEY**, warning of potential criminal action against merchants and customers purchasing CBD products, including ours.

199. Upon consulting with **THOMAS JOSEPH GOODMAN**, he advised halting sales.

200.　At that time, I had already invested over $50,000 in producing product specifically for B-1 Yoga.

201.　Due to this targeted enforcement, I was forced to retain the products, many of which had short expiration dates, leading to financial loss and disposal of unsellable inventory.

202.　It is worth noting that **THOMAS JOSEPH GOODMAN**, now a yoga instructor at B-1 Yoga, was actively involved in **JIM NUSSLE'S** congressional campaigns and shares historical connections with the political figures and entities involved in these targeted actions, including two failed attempts at obtaining the elected office of **DUBUQUE COUNTY ATTORNEY**.

203.　The malicious targeting of my businesses is part of a systemic, historically documented attack on my political character. Despite consistently adhering to legislative guidelines and regulations, every significant progress I made within the legal framework was undermined by changes to the rules or targeted enforcement, effectively sabotaging my financial and political gains.

204.　These actions demonstrate a pattern of prejudice and retaliation, tied to my political advocacy and efforts to operate fairly within the evolving cannabis and hemp industries.

## XVI. SYSTEMIC ABUSE AND VIOLATION OF RIGHTS: HISTORICAL AND CONTINUING PREJUDICE BY THE DUBUQUE COUNTY COURTS AND AFFILIATES

205.　As a teenager, I was subjected to systemic abuse by the **DUBUQUE COUNTY COURTS, IOWA DEPARTMENT OF HEALTH AND HUMAN SERVICES**, and the **STATE OF IOWA**, which has left lasting scars on my life and continues to manifest in current events.

206.　On **April 11, 2001**, I was involuntarily hospitalized as a "chronic substance abuser" and scheduled for a hearing on **April 13, 2001**.

207.　I was placed into a treatment program known as **TURNING POINT**, an outpatient substance abuse program run out of **MercyOne Hospital**, which continues to operate to this day. This program is based on outdated assumptions that contradict the **DEPARTMENT OF HEALTH AND HUMAN SERVICES'** own **Patent 6630507**, which recognizes cannabis as a neuroprotectant.

208.　In **May 2001**, the court received a report of non-compliance with treatment due to my own admission that I had used cannabis again. A hearing on **May 18, 2001**, determined I was out of compliance with outpatient treatment.

209.　On **May 29, 2001**, the court concluded that I was a chronic substance abuser, despite the absence of evidence other than my own admission. At the time, I was only 17 years old and did not fully understand the implications of my honesty.

210.　I was involuntarily committed to the **USE AND RECOVERY PROGRAM** in **Ames, Iowa**, where I was subjected to inhumane treatment, systemic abuse, and violations of my constitutional rights:

211.　Staff routinely conducted strip searches, during which I and others were touched inappropriately. These invasive and humiliating searches were unnecessary and abusive.

212.　Staff regularly insulted and even physically abused individuals with lesser mental faculties, further demonstrating the program's culture of cruelty.

213. I was denied my **First Amendment right to song**, as staff prohibited me from singing. This restriction was a clear violation of my right to free expression and an example of their excessive control over residents.

214. I overheard staff discussing which individuals they planned to retain in the program based solely on the amount of funding they were receiving from the State. This revealed to me that the program was more about human trafficking and revenue generation than rehabilitation.

215. Fortunately, due to a **process error by the courts,** I was released from the program on **June 8, 2001**. Without this error, I am certain I would have been kept in the program for the financial benefit of its operators.

216. My attorney during this ordeal was **TODD N. KLAPATAUSKAS** of **REYNOLDS & KENLINE, L.L.P.**, a law firm that is now a tenant of **CHRISTOPHER AARON MILLER'S** real estate holding company, **MILLER COMPANIES, LLC**.

217. In my professional capacity, I was responsible for setting up **REYNOLDS & KENLINE** in **Appfolio** property management software for **MILLER COMPANIES, LLC**

218. **NATALIA BLASKOVICH,** a magistrate named as a respondent in this case, was an attorney for **REYNOLDS & KENLINE**, joining the firm in 2007, and also served as a staff attorney for **IOWA LEGAL AID**, which is another tenant of **CHRISTOPHER AARON MILLER.**

219. These past abuses parallel more recent events, including the systemic judicial prejudice I have faced as an adult. For example, I submitted an affidavit in my most recent mental health case detailing events from **October 11, 2024**, at **St. Raphael Cathedral** in Dubuque, Iowa— a church with deep Historical ties to my family.

220. During the conversation recounted in the affidavit, I discussed the legal case of a close friend of mine, someone who almost became family, the brother of my former partner, and a client of **THOMAS JOSEPH GOODMAN**, who was framed for a crime by **Dubuque Police Officer Kyle Cross**: I will refer to him as **John Does** from here.

221. At approximately 18 years old, **John Doe's** ex-girlfriend began a relationship with **Officer Kyle Cross**, who stalked **John Doe** and framed him for a crime he did not commit.

222. **John Doe** pleaded his innocence to **THOMAS JOSEPH GOODMAN**, explaining the framing by **Officer Cross**, but Thomas dismissed his claims, saying, *"I hear it all the time, what do you want me to do about it?"*

223. **John Doe** convicted, incarcerated, and subjected to significant financial penalties.

224. Years later, **Officer Kyle Cross** was convicted of sexually abusing a 14-year-old girl.

225. Notably, **TODD N. KLAPATAUSKAS** represented **Kyle Cross** in the sexual abuse case. Despite the serious charges, **Kyle Cross** received a **10-year deferred jail sentence** and never served time behind bars.

226. These events, spanning decades, illustrate a systemic pattern of abuse, negligence, and prejudice toward me and others who are vulnerable to the machinations of powerful individuals and institutions in **Dubuque County**.

## XVII. POLITICAL ADVOCACY AND RETALIATION

227.    During the 2023 Iowa primary, I was an active and vocal presence at several presidential nominees' town hall events in Dubuque, IA. My focus was on holding candidates accountable, particularly regarding their stance on cannabis and pharmaceutical corruption.

228.    I attended multiple events for **VIVEK RAMASWAMY**, where I asked difficult questions about his investments in pharmaceuticals and his position on cannabis legalization. I attended at least five of his events, pressing him on these critical issues.

229.    I also attended **DONALD TRUMP**'s event in Dubuque. However, due to the overwhelming attendance, I was unable to ask any questions.

230.    **RON DESANTIS** held two events in Dubuque, both of which I attended. At the first event, I asked him a challenging question about the State of Florida's crony corrupt cannabis program, highlighting how half of the companies in Florida's medical cannabis market trade their future earnings on Canadian and U.S. OTC stock exchanges, while Florida citizens are not even permitted to grow cannabis for personal use. His response was less than satisfactory and gained criticism from several national cannabis industry publications.

231.    At his subsequent visit to Dubuque, I asked **RON DESANTIS** another pointed question regarding his stance on cannabis policy and the Cannabis Cartel in Florida. I also noted that **BRIDGE CITY COLLECTIVE**, a company linked to **CHRISTOPHER AARON MILLER**, is actively pursuing a Florida cannabis license. Once again, DeSantis faltered in his response, failing to address how Florida's licensing system perpetuates cronyism and excludes small operators from participating in the market. While I agree with **RON DESANTIS** on some aspects of his approach to cannabis—such as his criticism of the Cannabis Cartel—his inability to provide a clear path forward highlights the broader systemic issues within state-level legalization frameworks.

232.    On October 11, 2024, the same day I had the interaction with **THOMAS JOSEPH GOODMAN** and **CATHERINE ANNE GOODMAN**, at St. Raphael's Cathedral, I attended a rally held for **BERNIE SANDERS** at the Grand River Center in Dubuque, IA.

233.    Prior to the event, I met **BERNIE SANDERS** as he walked along the river path. I shook his hand and asked if he needed any recommendations while in town.

234.    During his town hall, when the floor opened for questions, I was the first to speak. I asked **BERNIE SANDERS** what the federal government could do to make cannabis a right for all individuals and not just corrupt oligopoly-controlled companies. Bernie responded that he and **KAMALA HARRIS** agree that cannabis should be legal at the federal level.

235.    I have been an outspoken advocate for fair cannabis practices, including industrial hemp, since my teenage years. As a young Republican at **Loras College**, I questioned then-representative **JIM NUSSLE** about using hemp for biofuels instead of corn and soy. His failure to provide a satisfactory answer only strengthened my commitment to this cause.

236.    In 2022, I became active again in the republican party, I proposed adding cannabis decriminalization to the Iowa GOP Party Platform. This advocacy reflects my lifelong commitment to fair cannabis policies and my dedication to standing up for what is right.

237.    My advocacy for cannabis reform reflects my long-standing belief that cannabis should be in the public domain, accessible to all citizens, rather than exploited by the wealthy at the expense of the poor. My active engagement in these high-profile political events and my public stance against exploitation have clearly made me a target for retaliation.

238.    **CHRISTOPHER AARON MILLER** and the other respondents in this case are retaliating against me because of my political character and my outspoken position that cannabis should not serve as a tool for exploitation by the elite. Their actions are part of a

coordinated effort to suppress my voice, discredit my advocacy, and protect their own financial interests in the cannabis industry.

## XVIII. CONCLUSION

239.    This affidavit comprehensively outlines the systemic inequities, judicial prejudice, and targeted retaliation I have faced throughout my life. These issues span decades, originating from my teenage years under the jurisdiction of the **DISTRICT COURT OF IOWA, IN AND FOR DUBUQUE COUNTY**, and continuing through my professional life as a whistleblower and advocate for transparency and fairness in cannabis regulation and other matters.

240.    As a teenager, I endured mistreatment by institutions including the **IOWA DEPARTMENT OF HEALTH AND HUMAN SERVICES, MercyOne**, and other entities that exploited their authority to impose punitive measures based on unfounded allegations. These early experiences revealed a systemic pattern of abuse, financial exploitation, and violations of constitutional rights—patterns that persist in the actions of the respondents in this case.

241.    My professional life has been marred by systemic prejudice and retaliation. From my efforts to build businesses in compliance with the Farm Bill to my outspoken advocacy for fair cannabis practices, I have been subjected to targeted actions aimed at discrediting me, undermining my businesses, and silencing my voice.

242.    **CHRISTOPHER AARON MILLER** epitomizes the systemic bias and conflicts of interest that plague my case. As a landlord for the **Iowa Department of Health and Human Services (DHHS)** and an investor in **UHCC, INC., d/b/a Bridge City Collective**, he profits from the cannabis industry while working to suppress my whistleblowing efforts. His financial dealings, conflicts of interest, and misuse of public resources demand scrutiny.

243.    My advocacy for cannabis reform and transparency has been weaponized against me. I have been subjected to political character assassination, judicial prejudice, and financial sabotage in an orchestrated effort to suppress my voice and deter me from exposing misconduct.

244.    This affidavit documents a pattern of systemic abuse that has followed me from my youth into adulthood, demonstrating a coordinated effort to discredit my work, destroy my livelihood, and limit my ability to seek justice.

245.    I formally request that all filings in my criminal case, mental health cases, and civil matters be incorporated into this affidavit as evidence and considered fact in this case. These filings provide a comprehensive record of the systemic bias, retaliation, and inequities I have faced.

246.    The deeply entrenched bias and impropriety outlined in this affidavit undermine the very principles of justice. I urge the court to address these systemic injustices, hold those responsible accountable, and ensure that my rights are protected.

247.    The respondents' actions represent a broader pattern of institutional corruption and abuse of power. This case is not just about my individual experiences but about exposing the systems that allow such injustices to persist unchecked. I ask the court to take decisive action to ensure that justice is served and that systemic reforms are implemented to prevent future abuse.

XIX. A CRY FOR JUSTICE: MAY IT PLEASE THE COURTS. (This section is written in Comic Sans MS. The next generation influenced my voice, and my friends 13-year-old suggested this font.) All of Gods Children Deserve Life, Liberty, and The Pursuit of Happiness, *Without Prejudice!*)

248. I simply ask: Why are you persecuting me for simply advocating for cannabis to be in the public domain? Why am I being punished for wanting to use cannabis freely for my religious purposes, for speaking about it publicly, and for embodying my beliefs openly and honestly?

249. While I face persecution for these principles, the respondents profit from my hard work. They profit from the cannabis industry that I have tirelessly advocated for, and they profit from the very systems designed to punish me for standing up for what is just.

250. They sell men into an oppressive system of indentured servitude, forcing slavery of the mind and body. They lock us away in a system that prioritizes profit over humanity, exploiting individuals for financial gain while hiding behind the guise of law and order.

251. They profit by putting me in the hospital, forcefully drugging me with pharmaceuticals that harm my mind and body. They profit from the systemic human trafficking of individuals into treatment programs that prioritize revenue generation over care.

252. They profit from tearing families apart, removing parents from their homes, enforcing a police state, and

perpetuating systemic fatherlessness that harms our youth and damages our future.

253. These actions do not protect the public; they enrich those in power at the expense of individuals like me who dare to challenge the status quo. My advocacy has been met with retaliation not because I have broken laws, but because I have spoken out against the corruption, greed, and injustice that fuel these systems.

254. I cry out for accountability. I cry out for justice. I cry out for the system to stop punishing those who fight for fairness, humanity, and transparency.

255. To those persecuting me, I ask: Why are you profiting from my suffering while punishing me for standing up for justice and fairness? Why are you allowed to profit from the very plant you seek to criminalize me for? Why do you profit from harming families and communities, perpetuating cycles of oppression, while silencing those who fight for something better?

I, **Austin-Andrew: Goodman**, affirm under penalty of perjury that the facts stated in this affidavit are true and correct to the best of my knowledge and belief.

**Respectfully submitted,**

**Autograph:**
**UCC 1-308**
**WITHOUT PREJUDICE**

_Austin-Andrew: Goodman, Private Beneficiary_

Austin-Andrew: Goodman, The Living Man, Private Beneficiary
**Date:** December 4th, 2024

**STATE OF** Colorado
**COUNTY OF** Chaffee

On this 4th day of Dec , **2024**, before me, the undersigned, a Notary Public in and for said County and State, personally appeared **Austin-Andrew: Goodman**, The Living Man, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the foregoing document, and acknowledged that he executed the same for the purposes therein contained.

**Witness my hand and official seal.**

KAREN M HOWLETT
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19974005027
MY COMMISSION EXPIRES 09-27-2025

**HOC EST ENIM CORPUS MEUM**

**LEX INIUSTA NON EST LEX**